## A10A2070. DELGIUDICE v. THE STATE.
(707 SE2d 603)

MIKELL, Judge.
Nelson Delgiudice, Jr., appeals from the trial court's denial of his amended motion for new trial following his conviction by a jury of kidnapping with bodily injury (Count 1 – Gamaliel Comancho Romero), four counts of aggravated assault (Counts 2, 3, and 4 – Romero, Count 6 – Alizeth Dorian Cardoza), and one count of the lesser included offense of false imprisonment on a kidnapping charge (Count 5 – Cardoza). He was sentenced to life in prison on Count 1, 20 years each on Counts 2, 3, 4, and 6, to run concurrent with the

sentence on Count 1, and ten years on Count 5, also to run concurrent with the sentence on Count 1.

1. In his first enumeration of error, Delgiudice argues that the verdict was decidedly and strongly against the weight of the evidence[1] and that the evidence was otherwise insufficient to enable a rational trier of fact to find him guilty of the crimes of which he was convicted.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and an appellant no longer enjoys the presumption of innocence. This court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia* and does not weigh the evidence or determine witness credibility.[2]

So viewed, the evidence here showed that Alizeth D. Cardoza lived in an apartment complex in Norcross. Because she and her boyfriend, Gustavo Carcamo, were late returning to the apartment on June 20, 2006, she called her upstairs neighbor, known to her as Hugo, to meet her then five-year-old son when he returned from summer school. Hugo lived with a man named Carlos in the apartment directly above Cardoza's. When Cardoza and Carcamo returned to the apartments, Cardoza went upstairs to get her son while Carcamo remained in the car. When she knocked on the apartment door, a man later identified as Delgiudice grabbed her by her hair, covered her mouth, and threw her on the living room floor. Delgiudice then placed a handgun at her right temple, tied her hands, and took her into a bathroom. Carlos, later identified as Gamaliel Comancho Romero, was tied up on the bathroom floor and had been stabbed in the buttock. Cardoza, still being restrained by Delgiudice, witnessed another man place a hot iron on Romero's back. Romero had come to the apartment earlier that day where he was attacked in front of Cardoza's apartment and dragged upstairs to Hugo's apartment. At least three men participated in the attack. Romero was put in the bathroom, tied up, and told by the men that they wanted drugs.

---

[1] OCGA § 5-5-21 authorizes the trial court to grant a new trial "where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." This "general ground" addresses itself to the trial court's sole discretion and allows the trial judge to sit as a thirteenth juror and weigh the evidence to determine whether to grant a new trial. There is nothing in the record here to indicate that the trial judge did not so exercise his discretion and there is nothing further regarding this alleged error for us to review. See *Hartley v. State*, 299 Ga. App. 534, 540 (3) (683 SE2d 109) (2009).

[2] (Footnote omitted.) *Buruca v. State*, 278 Ga. App. 650-651 (629 SE2d 438) (2006).

Cardoza was then taken by Delgiudice to another bathroom off the bedroom in the apartment where she saw Hugo, who was also bound and whose face appeared to have been beaten. Cardoza saw a third assailant in the bathroom with Hugo. At this point, Carcamo knocked on the apartment door and Delgiudice took Cardoza to the window and asked her who that was. When Cardoza identified Carcamo, Delgiudice told her to take a good look because it was the last time she was going to see him. Delgiudice and another man then took Cardoza into another bedroom where the man with Delgiudice told her they were looking for money and drugs.

Carcamo encountered Officer Rowell in the parking lot on another call. Carcamo told him his girlfriend was in the apartment and he thought the men inside had guns. Rowell went to the front door of the apartment, announcing that he was a police officer. Delgiudice and the other men then fled from the apartment by jumping off the balcony. Seven hundred grams of cocaine, worth approximately $70,000, were confiscated from the apartment. Backup officers responded and searched the area for the perpetrators. Officer Forrester searched a business area approximately a half mile from the apartment and apprehended co-defendant Peralta. Investigator Diaz interviewed Cardoza, Carcamo, and Perlata. Based on information obtained from Perlata, Diaz and other officers escorted Perlata to an extended stay motel in the area. Perlata had a key to room 502 at the motel. Detective Millsap observed a man walk to the door of room 502 and stand in front of it. As the officers approached the man, later identified as Delgiudice, he ran and was chased by the officers. Delgiudice was finally chased down by Sergeant Atwater, who ordered Delgiudice to get on the ground. When Delgiudice did not and, instead, turned toward Sergeant Atwater, he was shot with a taser and arrested. Sergeant Atwater heard Delgiudice speak Spanish following his arrest. Officers later went into Peralta's motel room and observed that the beds were in disarray and there were three or four suitcases in the room.

Cardoza, a native of El Salvador, had worked in a restaurant in the area which was frequented by people from the Dominican Republic. She advised the officers that, in her opinion, the assailants in the apartment were Dominican. The man known to Cardoza as Hugo blended into the crowd following the arrival of the police and left the scene. Romero was taken to the hospital, where he was treated and released. A year later, Romero was arrested, convicted in federal court of conspiracy to possess with intent to distribute five kilos of a mixture containing cocaine, and sentenced to ten years to serve. He testified at Delgiudice's trial and, based on his conversations with Delgiudice, Romero was also of the opinion that Delgiudice was Dominican. At the time of Delgiudice's trial, Romero was

under indictment for possession of the cocaine found in Hugo's apartment.

Cardoza was shown a photo array containing six photographs on June 23, 2006, and she immediately picked Delgiudice's photo as the man who held the gun to her head during the incident. Cardoza also identified Delgiudice in court.

We find the evidence legally sufficient to support the crimes of which Delgiudice was convicted.[3]

2. Delgiudice's fifth enumeration of error is that the trial court erred in denying his motion to suppress Cardoza's identification of him in a pretrial photo array because the photo array was unduly suggestive.

On appellate review of a trial court's order on a motion to suppress evidence, we construe the evidence most favorably to the upholding of the trial court's findings and judgment and affirm unless the court has committed an error of law.[4]

"An unduly suggestive procedure is one which leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is equivalent to the authorities telling the witness, 'This is our suspect.' "[5] Where the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification.[6]

Below and here, Delgiudice's sole argument consists of his assertion that he was the only black man in the array among five Hispanic males. Pretermitting the issue of whether it is possible to be both black and Hispanic,[7] we note that "[t]he fact that the accused may be of a different race or ethnicity does not in and of itself make the identification procedure impermissibly suggestive, especially when there are other individuals in the line-up having roughly the same characteristics and features as the accused."[8] We have examined the array and conclude that the trial court properly denied the motion to suppress. The array was not impermissibly suggestive because the six men depicted are of the same race or ethnicity, the same general age group, and have similar hairstyles and facial hair.[9]

3. In his second, third, sixth, and eighth enumerations of error,

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] *State v. Ellison*, 271 Ga. App. 898, 901 (2) (a) (611 SE2d 129) (2005).

[5] (Citation and punctuation omitted.) *Humphrey v. State*, 281 Ga. 596, 597 (1) (642 SE2d 23) (2007).

[6] *Whatley v. State*, 266 Ga. 568, 569 (2) (468 SE2d 751) (1996); see also *Davis v. State*, 286 Ga. 74, 76 (2) (a) (686 SE2d 249) (2009).

[7] *Woods v. State*, 208 Ga. App. 565, 566 (2) (431 SE2d 167) (1993) (Juror, in responding to *Batson* challenge, identified as either black or Hispanic.)

[8] (Citation omitted.) *Humphrey*, supra.

[9] *Russell v. State*, 288 Ga. App. 372, 373 (2) (654 SE2d 185) (2007).

Delgiudice argues that his trial counsel rendered ineffective assistance. These enumerations will be addressed together.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. . . . *Strickland v. Washington*[.][10] If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.[11]

Moreover, "there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence."[12]

Finally, "[w]e will not reverse on the basis of ineffective assistance of counsel unless trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial court could not reliably have produced a just result."[13]

(a) In his third enumeration, Delgiudice contends that trial counsel was ineffective when he elicited testimony from Detective Milsap that another witness, besides Cardoza, had identified him as being at the scene.

During cross-examination, Delgiudice's trial counsel asked Detective Millsap ". . . other than Ms. Cardoza, there has been no one who has placed my client in that apartment on June 20th?" In response, the detective stated: "[y]es, there has been. Yes, there has been someone else that said he was there." At that point, defense counsel asked to approach the bench and the jury was excused.[14]

---

[10] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[11] (Citations and punctuation omitted.) *Bridges v. State*, 286 Ga. 535, 537 (1) (690 SE2d 136) (2010).

[12] Id., citing *Flanigan v. State*, 269 Ga. 160, 162 (2) (d) (496 SE2d 255) (1998).

[13] (Citation omitted.) *Powell v. State*, 272 Ga. App. 628, 630 (2) (612 SE2d 916) (2005).

[14] Counsel and the court then engaged in a lengthy discussion regarding what had been contained in discovery, prior court hearing transcripts, etc. It is apparent from this exchange that defense counsel was surprised by the detective's statement and that Peralta's identification of Delgiudice at the extended stay motel was the basis upon which the detective said someone else had identified Delgiudice as having been at the apartment. The trial court

Because the discussion between the court and defense counsel indicates that defense counsel had done extensive discovery in the case and was surprised by the detective's answer, we do not find that counsel's performance was deficient. Further, even if we were to conclude otherwise, the error did not so undermine the proper functioning of the adversarial process that the trial court could not have reliably produced a just result.[15]

(b) Delgiudice also contends, in his second enumeration, that his trial counsel rendered ineffective assistance by failing to object to Cardoza's tainted in-court identification of him.

Delgiudice's argument states that Cardoza had seen his photograph contained in the photo array "several times." This, however, is not supported by the record before us. During cross-examination, Cardoza did acknowledge that, sometime after her identification of Delgiudice from the photo array, her immigration attorney had obtained a photo of Delgiudice from the internet and gave it to her. This photo was apparently Delgiudice's booking photograph, but it was not the one contained in the photo array. Cardoza had had the booking photograph for approximately a month and a half before trial. The record further shows that she saw the photo array twice, once when the detective showed it to her and she identified Delgiudice and once during her testimony at the trial of co-defendant Peralta.

Trial counsel, asked during the motion for new trial hearing why he did not ask the trial court to strike Cardoza's in-court identification of Delgiudice, answered "[b]ecause I didn't." He also acknowledged that his failure to ask for a mistrial on this ground was not a strategic decision.

We first consider whether Delgiudice's in-court identification was tainted under these circumstances. We note that a claim of a tainted in-court identification "generally is raised in the context of an out-of-court identification which an appellant asserts was unduly suggestive, thereby tainting the in-court identification."[16] That is the situation in the case relied upon by Delgiudice here.[17] That is not the situation in the instant case where Cardoza, three days after the incident, immediately identified Delgiudice from a photo array. Further, "[a]n allegedly suggestive pretrial encounter must be the result

prohibited the State's request that it be allowed to ask the detective to whom he was referring.
[15] Id.
[16] *Chisholm v. State*, 231 Ga. App. 835, 839 (4) (500 SE2d 14) (1998), overruled on other grounds in *Murphy v. State*, 270 Ga. 72, 74 (2) (c) (508 SE2d 399) (1998).
[17] *Joncamlae v. State*, 267 Ga. App. 214, 215-216 (1) (598 SE2d 923) (2004) (Counsel rendered ineffective assistance where two victims, unsure of their identification, saw an individual photo of the defendant the day before trial in the district attorney's office and counsel failed to object.)

of either police or prosecution action to have an effect on the admissibility of a subsequent in-court identification."[18] Here, Cardoza's civil attorney provided her with the copy of Delgiudice's booking photo.

Delgiudice's argument appears to be that Cardoza's having seen the photo array twice and having a copy of his booking photo creates a substantial likelihood of misidentification.

> The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.[19]

Analyzing these factors, we do not find Cardoza's in-court identification of Delgiudice tainted. Her possession of the photo and having seen the array twice merely created an issue of witness credibility to be explored by the defense on cross-examination and to be ultimately determined by the jury.[20]

As discussed above, the booking photo was provided to Cardoza by her civil attorney, and trial counsel's failure to object to its introduction or to request that the in-court identification be struck was not deficient.

(c) In his sixth enumeration, Delgiudice argues that trial counsel was ineffective for failing to object to the introduction of the photo array and identification affidavit of Cardoza.

As discussed in Division 2, supra, the photo array was not impermissibly suggestive and defense counsel's motion to suppress it was properly denied. Given this determination, Delgiudice cannot establish that his attorney was ineffective for failing to object to the admission of the array during trial.[21]

(d) Delgiudice's eighth enumeration of error is that trial counsel was ineffective because he did not object to the trial court's failure to merge his convictions of Counts 2, 3, and 4 (aggravated assault) with his conviction on Count 1 (kidnapping with bodily injury). As discussed infra in Division 4, because the State concedes that the trial court erred in not merging these offenses, this issue is moot.

4. The State concedes, as argued by Delgiudice in his seventh

---

[18] *Green v. State*, 279 Ga. 455, 458 (614 SE2d 751) (2005).

[19] (Citation and punctuation omitted.) *Chisholm*, supra.

[20] Id. at 840 (4).

[21] *Thomas v. State*, 273 Ga. App. 357, 362 (4) (b) (615 SE2d 196) (2005).

enumeration, that Counts 2, 3, and 4 merge as a matter of fact with Count 1 and it was error for the trial court to impose separate sentences on Counts 2, 3, and 4. Therefore, this case must be remanded for resentencing.

5. Delgiudice's fourth enumeration of error is that the trial court erred in denying his motion for new trial based on newly discovered evidence, i.e., the fact that the state charges against Romero regarding the 700 ounces of cocaine found in the apartment had been dismissed following Delgiudice's trial.

> The standard for granting a new trial on the basis of newly discovered evidence is well established. It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.[22]

All six requirements must be complied with in order to secure a new trial.[23]

Delguidice argues that the effect of the dismissal "is not only to impeach the credit of Mr. Romero. That is, the dismissal shows Mr. Romero's bias and motive to testify in accord with the State's theory of the case." As recently reiterated by our Supreme Court, however, credibility is attacked by showing that the pending charges and their dismissal reveal a possible bias, prejudice, or ulterior motive on behalf of the witness to give untruthful or shaded testimony in an effort to please the State.[24] Therefore, Delgiudice cannot comply with the sixth requirement and his motion for new trial on this ground was properly denied.

*Judgment affirmed in part, reversed in part, and case remanded for resentencing. Smith, P. J., and Adams, J., concur.*

DECIDED MARCH 14, 2011 — ▮▮▮▮▮▮▮▮▮▮

---

[22] (Citations and punctuation omitted.) *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980).

[23] Id.

[24] *Brown v. Baskin*, 286 Ga. 681-682 (690 SE2d 822) (2010).

*G. Richard Stepp*, for appellant.
*Daniel J. Porter, District Attorney, James M. McDaniel, Assistant District Attorney*, for appellee.